# Fifty-first Street and Parkside Avenue Fund

*James A. Montgomery, Jr.,* and *Karl I. Schofield,* for petitioner.

*Frank F. Truscott* and *Irving N. Kieff,* for Commonwealth.

*James E. Gallagher, Jr.,* for Archbishop of Philadelphia.

*Charles F. Gerhard,* for various contributors.

KLEIN, P. J., May 18, 1956.—In September 1953 a report was widely circulated in Philadelphia that a group of children, playing in Fairmount Park, had witnessed an apparition of the Virgin Mary in a bush near the corner of Fifty-first Street and Parkside Avenue. As a result, tens of thousands of people came to view the bush during the ensuing weeks. A great number of these people left small sums of money at

the site. Some left religious objects such as crucifixes, rosary beads, figurines, pictures and prayer stools. Others deposited a wide assortment of miscellaneous items including crutches, braces, eyeglasses and articles of similar nature as well as articles of personal adornment, such as wedding rings and costume jewelry of neglible value.

The money and some of the objects were collected periodically by the Fairmount Park Guards at the direction of their superiors. The cash thus accumulated amounted to $6,339.67 (since increased to $6,478.57), and had been designated, for convenience, the "Fifty-First Street and Parkside Avenue Fund".

The Commissioners of Fairmount Park were advised by the City Solicitor of the City of Philadelphia in Formal Opinion No. 102, dated March 11, 1954, to petition the orphans' court for an order of distribution applying the fund, "To religious purposes consistent with the intention of the donors which may be gathered from the circumstances surrounding the making of their offerings". In conformity with the opinion, the Commissioners of Fairmount Park filed a petition with the court requesting that an appropriate order be entered for distribution or disposition of the fund.

In due course, the matter was listed for hearing on November 17, 1954. In order to give all interested parties an opportunity to appear and to be heard, notice of the hearing was given wide spread publicity in the press, and signs were posted in the vicinity of the bush.

James E. Gallagher, Jr., appeared for His Excellency, Most Rev. John F. O'Hara, Archbishop of Philadelphia. He stated that he had consulted the Archbishop and the Chancellor of the Diocese and they had instructed him to inform the court "that so far as the Catholic Church in this Archdiocese is concerned

no official stand has been taken with respect to this reported vision in Fairmount Park".

Irving N. Kieff, Deputy Attorney General, appeared in behalf of Frank F. Truscott, Attorney General of the Commonwealth of Pennsylvania, as the conservator of charities, under section 10 of the Estates Act of 1947. Mr. Kieff stated that his office "was not taking a position with respect to the fund", and was subjecting itself to the disposition of the court. He also stated that "if the court decides that it has no jurisdiction in the matter, the Attorney General is satisfied to permit the Commissioners of Fairmount Park to determine what use is to be made of this money".

At the hearing, Mr. Montgomery, who appeared on behalf of the city, made the following statement with respect to the status of the fund with which the court is in full accord:

"As we see it there are three conceivable alternatives. One is that the persons merely abandoned the money, second, that it was a gift to the Commission, and third, that it was a transfer to the Commission in trust for some charitable or religious purpose."

Mr. Montgomery contended that it could be assumed from the conduct of the contributors that they did not intend an abandonment of the money left by them. With this, we agree. Although it seems reasonable to believe that the persons depositing the money intended to surrender all dominion over their offerings, it is equally valid to assume that these people knew that the funds were being collected by the park guards and turned over to the park commissioners and would be used by them for some lawful purpose consistent with the circumstances under which the money was left.

"Abandonment is distinguished from all other modes of parting with property or rights by its purely voluntary character and by its failure to transfer title to, or ownership of, the thing abandoned to any other

person": 1 C. J. S. Abandonment §2. Abandonment is inconsistent with sale or gift which involve intention to transfer title to the buyer or the donee: Pearlman Trust, 348 Pa. 488, 493 (1944). See also Hibbert v. Dalton, 47 D. & C. 188 (1942).

We therefore conclude that there was no abandonment of the money by the donors.

It remains for us to decide whether the donors intended to give the funds to the commissioners as an outright unrestricted gift or as a gift in trust for religious purposes.

Mr. Montgomery argued against the proposition that the donors intended to make an outright gift to the park commission. He took the position that the gifts were "made under circumstances connected with the apparition," and that the persons "making the deposits must have intended that the money be used for some charitable purpose although they did not define the purpose". The effect of his argument is that a trust was created.

The question submitted to us for determination is primarily a factual one. The most conclusive way to determine the facts in a novel case such as this would have been to receive the statements of all persons who contributed to the fund, but, as the money was left by a countless number of persons, in sums varying from a few pennies to a few dollars, it was obviously impossible to do this. Efforts were made to induce as many of the donors as possible to appear and express their views. In spite of the extensive publicity given to the hearing, only nine persons appeared to offer testimony. Of this number six were represented by Mr. Charles F. Gerhard, a respected member of our bar, who has taken a great personal interest in the problem.

The following excerpts, taken from the testimony of the contributors who appeared, seem to summarize

fairly, the views of the people who deposited money at the bush.

John C. Bonner gave a total of $10 or $12. Mr. Bonner, testified, page 13, as follows:

"Q. Was there any agreement between you and other people who left money as to the use to which the money should be put?

"A. Never in any way so far as I am concerned. I never discussed the matter or considered what it should be used for. I just donated in good spirit and forgot about it.

"Q. You just didn't abandon the money; you didn't want anybody at all to pick it up?

"A. No, I understood the guards. . . .

"Q. Any use to which the Commissioners of Fairmount Park would put the money was satisfactory to you?

"A. That's right.

"Q. You did not do this as a result of an agreement with other people?

"A. No, sir, no understanding with anybody—just a voluntary act of my own. I think most of them who left it out there had the same spirit about it. I never discussed it with anybody."

Dorothy K. Deery contributed about $50. When asked what her purpose was in leaving the money, she said, page 23:

"A. Well, I left it in honor of our Lady, the Blessed Virgin, and I hoped it would be used by the Park Commissioners for accommodations and to keep the grounds up."

Laurence Larthey testified, page 20:

"Q. The primary purpose of your gift was for the preservation of the area around the bush and not for religious purposes; is that right?

"A. Yes. The first one, not for religious purposes."

Morris Felt stated that he left "approximately $19, $20 or $21". He testified, page 28, as follows:

"Q. Would you be satisfied if your contributions were used by the Park Commission, in its sound discretion, to make such accommodations for the public as it saw fit?

"A. I certainly would."

Dorothy M. Murareski contributed "possibly between $15 and $20". The following extract from her testimony appears at page 32:

"Q. If the Park Commission in its sound discretion were to provide running water for that locality, erect a shelter, and landscape the particular spot, do you feel that it would be carrying out the intentions for which you had left the money?

"A. Not only me. I think everyone would be pleased with that."

Julian J. Kennedy said that he and his wife left "at least, a couple of dollars". He stated, further, that he would be satisfied if the money which he and the other people left "were utilized in the discretion of the Park Commission".

Elizabeth M. Tryon testified, page 53:

"Q. You are willing to leave the matter within the discretion of the Park Commission as to the disposition of the funds?

"A. Yes."

Does this testimony support the conclusion that the donors intended to create a trust? We think not.

What we said in Raistrick's Estate, 46 D. & C. 225 (1942), is particularly appropriate in the present case:

"The burden of proving the establishment of a trust is upon him who makes the allegation: Tunnell's Estate, 325 Pa. 554 (1937) ; Gribbel v. Gribbel et al., 341 Pa. 11 (1941). The existence of a trust depends

solely on the intention manifested by the settlor and the declaration of intention must be definite, clear, and explicit, and must embody all the essential elements of a valid trust: Brubaker et al. v. Lauver et al., 322 Pa. 461 (1936). Furthermore, the evidence required to prove the creation of a trust under circumstances such as exist in this case must be not only clear, precise, and indubitable, but also free from ambiguity and subject to but one interpretation. See Gritz v. Gritz et al., 336 Pa. 161 (1939), Gribbel v. Gribbel et al., supra, and Penrose's Estate, supra."

Professor Bogert, in his scholarly work "Trust and Trustees" says, volume 1, sec. 46, p. 299:

"The creation of a trust is a means of providing benefits for another, sometimes for a consideration, but more generally as a gratuity. There are many ways of voluntarily conferring a property benefit on another. The intent to create a trust must be definite and particular. It must show a desire to pass benefits through the medium of a trust, and not through some related or similar device."

Professor Bogert continues at page 301:

"The donee may be expected to accomplish the named object through his own voluntary action as an absolute owner. The description of purpose must expressly or impliedly indicate an intent that there shall be accomplishment through the use of a trust, if a trust is to be set up."

The size of the individual gifts, plus the fact that there was no common agreement or understanding among the donors, negatives the suggestion that the creation of a trust was intended. Apparently most of the money was left on impulse, in the same manner that one would drop a quarter into a tambourine passed around by a Salvation Army lassie or into a hat at a neighborhood sand lot baseball game.

The bush in which the vision is reported to have been seen is in a section of Fairmount Park which is ordinarily not frequented by large numbers of visitors. Consequently, shelters from the elements, park benches upon which persons can rest, drinking water and toilet facilities are all scarce and completely inadequate to meet the needs of the vast throngs attracted to the vicinity of the bush by the alleged miracle. Under these circumstances, it is much more reasonable to assume that these small unsolicited offerings were intended as gifts to enable the Commissioners of Fairmount Park to improve the facilities in the area rather than as a religious or charitable trust of any kind.

The hearing judge has therefore reached the following conclusions:

(1) That the money making up the "Fifty-First Street and Parkside Avenue Fund" was left at the bush by a great many individuals in small amounts, voluntarily and spontaneously, and that the contributors did not discuss the purpose for which the money was to be used with each other or with any other person;

(2) That the money was not left as a religious offering and that no trust was created, religious or otherwise; and

(3) That the contributors intended the money as outright gifts to the Commissioners of Fairmount Park to be used by them for such purposes as they, in their absolute discretion, might deem best for the general improvement of the section of the park in which the bush is located.

The Orphans' Court is a court of limited jurisdiction, exercising only such power as is given by statute, expressly or by necessary implication: Hunter's Pa. O.C. Commonplace Book, vol. 11, p. 946. Although the Orphans' Court has exclusive jurisdiction of inter vivos trusts it is without jurisdiction if a valid trust

has not been created.* Having concluded in the instant case that the contributions were in the nature of outright gifts and that a trust was not created it follows that the Orphans' Court is without jurisdiction in these proceedings and has no authority to grant the prayer of the petition to enter an order of distribution applying the fund to religious or any other charitable purpose. The prayer of the petition is accordingly dismissed.

At the hearing, William H. Noble, Jr., Acting Director of the Fairmount Park Commission, appeared and testified at considerable length. From Mr. Noble's testimony it is obvious that the widespread emotional interest originally displayed in the bush has virtually disappeared. During the entire calendar year of 1955 only $4.15 was left at the bush. Shortly after the alleged apparition was reported, as many as 25,000 persons visited the scene of the alleged vision in a single day. This number has dropped drastically. Mr. Noble stated that on Sundays and week-ends not more than 20 or 30 people visited the bush and "during the week-days less than that". These figures indicate that fewer visitors are presently being attracted to this area than in many other sections of Fairmount Park.

The court recognizes the extremely delicate nature of the problem that confronts the Commissioners of Fairmount Park. Some sincere people are convinced that a miracle has taken place and that an apparition of the Virgin Mary actually appeared in this bush. However, no responsible church authority has taken any notice of the occurrence. Certainly, it is not for

---

* Exclusive jurisdiction over intervivos trusts was conferred upon the orphans' courts of all of the counties except Philadelphia by section 301 of the Orphans' Court Act of August 10, 1951, P. L. 1163. Act no. 822 approved by the Governor on February 10, 1956, amends the act and similarly gave the Philadelphia Orphans' Court exclusive jurisdiction in such cases.

the park commissioners to express any views with respect to the authenticity of the alleged apparition. It is also clear that, as public officials, they are forbidden to use public property for sectarian religious purposes. They have, however, after careful study of the entire problem, formulated a plan which should be acceptable to all reasonable persons having an interest in the matter.

Mr. Noble stated that a rustic fence would be placed around the bush with openings at both ends. He also submitted plans for a proposed shelter to be erected in the park in the immediate vicinity. This shelter could be built for approximately the amount of money in the fund and appears to be the most practical and sensible manner in which this fund could be utilized.

Mr. Noble also produced a number of photographs showing the conditions existing in the vicinity of the bush. These pictures reveal that the area is in a disgraceful state, indiscriminately littered with broken articles of furniture and a miscellaneous assortment of discarded objects, religious and otherwise. Much of this has been left by well-meaning, devout persons; some, obviously by irreverent scoffers. The general effect presents a picture of an unsanitary trash collection which certainly cannot be tolerated in a public park.

Mr. Noble stated that the commission intended to remove all of the objects to the Park Guard Headquarters, where they may be claimed by the persons who left them. The commission has also compiled a set of rules, which will be printed on cards and posted near the bush. These rules stated in part:

"No furniture, fresh or artificial flowers, figurines, containers or similar objects are to be left in the area.

"No signs or printed matter, other than these rules, are to be posted.

"All objects previously left here may be reclaimed at Park Guard Headquarters, 44th Street and Parkside Avenue.

"Park rules regarding litter will be strictly enforced."

Having concluded that this court has no jurisdiction in the matter, and that the money in question was left as an outright gift to the commission, and not as a religious offering creating a trust, it becomes unnecessary for the hearing judge to pass upon the plans for the shelter or the rules of conduct to be observed by park visitors.

The hearing judge wishes to observe, however, that if he did possess jurisdiction in the matter, he would wholeheartedly approve both the plans for the shelter and the promulgated rules of conduct. They manifestly indicate an intelligent and practical solution of a most interesting and unusual problem.